UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

**Case No.**

**United States of America**                                              Plaintiff,

**v.**

**Lee County Fiscal Court and**
**Joseph R. Broadwell**                                              Defendants.

---

### COMPLAINT

---

The United States of America, by and through the undersigned counsel, alleges as follows:

### INTRODUCTION

1.      The United States brings this action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law or equitable theories of payment by mistake and unjust enrichment.

2.      Lee County Fiscal Court operated an ambulance service, Citizens of Lee County Ambulance Service ("Lee County Ambulance"), in Lee County, Kentucky. Joseph R. Broadwell was the ambulance service's director. At Broadwell's direction, Lee County Fiscal Court defrauded federal health insurance programs by knowingly submitting false claims for nonemergency transports of dialysis patients.

3.      Despite receiving yearly training on the federal and state health insurance requirements for ambulance transports, Broadwell directed Lee County Ambulance to provide and bill for transports that did not meet these requirements.

4.      First, Lee County Ambulance billed for transport of a dialysis patient to a facility that was not the nearest available facility, directly in violation of federal regulations.

5.     Second, Lee County Ambulance transported dialysis patients that could have been transported by another means without endangering their health. Two dialysis patients, for example, were even able to walk and climb into the ambulance with little to no assistance both before and after dialysis treatment. Lee County Ambulance's billing company told Broadwell repeatedly that the transport of these patients was not medically necessary and should not be billed to federal health insurance programs. Broadwell directed the billing company to "move forward and bill for [the] runs" regardless of these concerns.

6.     Third, Lee County Ambulance used falsified or fraudulent medical records, including ambulance transport records, known as run sheets, and physician certification statements, to document or support the transport of dialysis patients. Broadwell directed Lee County Ambulance employees to falsify run sheets by misrepresenting patients' ability to walk and to falsify physician certification statements for these dialysis patients by either completing the statements themselves, altering the date on which the physician signed the statements, or forging the physicians' signatures.

7.     The false or fraudulent claims that Lee County Ambulance submitted, and that Broadwell caused it to submit, have resulted in the loss to federal health insurance programs in excess of $360,000.

## JURISDICTION AND VENUE

8.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33, and under common law and equity. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1331. This Court also has jurisdiction pursuant to 31 U.S.C. § 3732(a), in that at all times relevant to this Complaint, the defendants transacted business within the Eastern District of Kentucky. Additionally, pursuant to 28 U.S.C. § 67(a), this Court has supplemental jurisdiction with regard to the common law and equitable causes of action.

9.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), as well as 31 U.S.C. § 3732(a). The defendants can be found, reside, and transact business within this District, and the acts proscribed by the False Claims Act occurred within this District.

## PARTIES

10.      Plaintiff, the United States of America (the "United States"), sues on its own behalf and on behalf of the United States Department of Health and Human Services ("HHS") and its operating division, the Centers for Medicare & Medicaid Services ("CMS"). At all times relevant to this Complaint, CMS administered and supervised the Medicare and Medicaid programs.

11.      Defendant Lee County Fiscal Court ("Fiscal Court") is the governing body of Lee County, Kentucky. The County Judge/Executive presides over the Fiscal Court. Stephen Mays was elected as the Lee County Judge/Executive in 2007 ("Judge/Executive Mays").

12.      Between at least October 10, 2001, and continuing until June 15, 2016, the Fiscal Court operated an ambulance service as the Citizens of Lee County Ambulance Service ("Lee County Ambulance"). Lee County Ambulance provided ambulance transportation services to individuals, including Medicare and Medicaid beneficiaries who reside or resided in Lee County.

13.      Defendant Joseph R. Broadwell ("Broadwell") is a resident of Beattyville, Lee County, Kentucky and a citizen of the United States. The Fiscal Court named Broadwell as the Ambulance Service Director in the summer of 2008. In January 2009, Judge/Executive Mays appointed Broadwell to be the Deputy Judge/Executive of Lee County.

## THE FALSE CLAIMS ACT

14.      The False Claims Act ("FCA") prohibits knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

The FCA further prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

15.     Under the FCA, "knowingly" means that with respect to information, a person (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). The FCA does not require that a defendant have a specific intent to defraud the federal government. 31 U.S.C. § 3729(b)(1)(B).

16.     For each violation of the FCA, a defendant is liable to the United States for civil penalties of not less than $5,000 and not more than $10,000 per false claim, as adjusted for inflation, and three (3) times the amount of damages that the federal government sustained as a result of the defendant's fraudulent actions. 31 U.S.C. § 3729(a)(1).

## FEDERAL HEALTH CARE PROGRAMS

### A.     The Medicare Part B Program

17.     The United States, through HHS, administers the Supplementary Medical Insurance Program for the Aged and Disabled established by Part B, Title XVIII, of the Social Security Act under 42 U.S.C. §§ 1395j to 1395w-4 ("Medicare Part B" or "Part B"). HHS has delegated the administration of the Medicare program to its component agency, CMS.

18.     Medicare Part B is a federally-subsidized health insurance system for individuals who are 65 years of age or older, who have certain disability status, and/or who have certain disease conditions including, of particular importance here, End Stage Renal Disease ("ESRD"). Eligible people may enroll in the Medicare Part B Program to obtain benefits in return for payments of monthly premiums as established by HHS. In general, the Medicare Part B program reimburses suppliers of Part B covered health care services, including ambulance transport services, based on fee schedules. *See* 42 U.S.C. §§ 1395j to 1395w-4.

19.     The United States reimburses suppliers of Part B services via their submission of Medicare claims forms. Payment for Part B services originates through the Medicare Part B Trust Fund through CMS, which in turn, contracts the task of processing and paying Part B claims to private insurance carriers under 42 U.S.C. § 1395u. Those carriers, referred to by CMS as Medicare Administrative Contractors ("MACs"), are also authorized to conduct audits to ensure that proper payments are made to suppliers of services. *See* 42 U.S.C. § 1395u(a)(1)(C); 42 C.F.R. § 421.200(e). Because of the volume of claims they must process, MACs generally pay a provider's or supplier's claim for services in the first instance based on the provider's or supplier's representation that the service is payable under all applicable Medicare rules including eligibility, coverage, and coding.

20.     At all times relevant to this Complaint, HHS, through CMS, administered the Medicare Part B program in the Commonwealth of Kentucky through CGS Administrators, LLC ("CGS"), a MAC that processed and paid Medicare Part B claims on behalf of CMS.

**B.    The Medicaid Program**

21.     Medicaid, created in 1965 under Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. HHS, through CMS, administers the federal aspects of the Medicaid program, including by providing federal matching funds and ensuring that states comply with minimum standards in their administration of the program. In Kentucky, the Medicaid program has been established pursuant to KRS Chapter 205 and administrative regulations set forth in 907 KAR Chapter 1. The Kentucky Cabinet for Health and Family Services, Department for Medicaid Services, administers the Medicaid program in Kentucky ("Kentucky Medicaid").

22.     Funding for Medicaid is shared between the federal government and those states participating in the Medicaid program. Approximately 70 percent of each dollar spent

by Kentucky Medicaid is contributed by the federal government pursuant to Title XIX of the Social Security Act.

23.     Individuals or entities who are participating providers in Kentucky Medicaid, such as the Fiscal Court as Lee County Ambulance, may seek reimbursement from the program for services rendered to patients who are program beneficiaries, provided that the services are rendered in compliance with the laws, rules, regulations, policies, and procedures governing reimbursement. All Kentucky Medicaid providers sign a provider agreement promising that they will follow all applicable state and federal laws and regulations regarding the Medicaid program.

24.     At all times relevant to the events described in this Complaint, the Fiscal Court was an enrolled provider in the Kentucky Medicaid program, and submitted claims to managed care organizations or prepaid ambulatory health plans that process claims on behalf of Kentucky Medicaid.

### LEE COUNTY FISCAL COURT'S PARTICIPATION IN FEDERAL HEALTH CARE PROGRAMS

25.     The Fiscal Court's enrollment as a participating provider in the Medicare Part B program was effective on July 1, 2002. The Fiscal Court's National Provider Identification ("NPI") number, 1841273257, was enumerated on November 21, 2005. The Fiscal Court listed Citizens of Lee County Ambulance Service ("Lee County Ambulance") as its doing business as name associated with the NPI number.

26.     Between at least July 1, 2002, and June 15, 2016, the Fiscal Court, as Lee County Ambulance, submitted claims to CGS seeking Medicare Part B payment for ambulance transportation services. To bill the Medicare Part B Program, the Fiscal Court, as Lee County Ambulance, submitted electronic or hard-copy claim forms called CMS-1500 claim forms. Each claim was assigned a unique identification number.

27.     The hard-copy CMS-1500 claim form states that the supplier signing the form "certify[ies] that the services shown on this form were medically indicated and necessary for the health of the patient."

28.     On March 1, 2012, the Fiscal Court, as Lee County Ambulance, contracted with Medical Claims Assistance, Inc. ("MCA"), a third-party billing agency, to submit claims to CGS on its behalf.

29.     That same day, the Fiscal Court successfully updated its Medicare enrollment record to list MCA as its billing agency and Judge/Executive Mays as Director/Officer, Managing Employee, and Authorized Official.

30.     Additionally, after contracting with MCA to submit claims on its behalf, the Fiscal Court, by and through Judge/Executive Mays, submitted a re-verification enrollment application to Medicare on December 1, 2012.

31.     In this application, Judge/Executive Mays, on behalf of the Fiscal Court, certified that:

    a. The Fiscal Court understood "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions . . . and on the supplier's compliance with all applicable conditions of participation in Medicare" and

    b. The Fiscal Court would "not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and [he would] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

32.     Furthermore, to submit electronic claims to CGS, the Fiscal Court, as Lee County Ambulance, executed an Electronic Data Interchange Enrollment Agreement in which it agreed to "submit claims that are accurate, complete, and truthful" and acknowledged that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who

misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."

### REGULATIONS REGARDING AMBULANCE TRANSPORT

33.     Medicare Part B pays only for medical services, including ambulance transport services, that are reasonable and necessary for the diagnosis or treatment of illness or injury. 42 U.S.C. § 1395y(a)(1)(A).

34.     In the context of nonemergency ambulance transports, Medicare Part B will pay for such services only if the patient's medical condition is "such that all other forms of transportation are contraindicated." 42 C.F.R. § 410.40(d)(1). Thus, "[i]n any case in which some means of transportation other than an ambulance could be used without endangering the individual's health, whether or not such other transportation is actually available, no payment may be made for ambulance services." Medicare Benefit Policy Manual, Chapter 10, Section 10.2.1.

35.     Additionally, for nonemergency, scheduled, repetitive ambulance transports, Medicare Part B will pay for such services only if a written order from the patient's attending physician ("Physician Certification Statement" or "PCS") is obtained by the ambulance provider prior to any service being provided to the patient. 42 C.F.R. § 410.40(d)(2)(i). This order certifies that the transport is medically required and all other forms of transportation are contraindicated. *Id.*

36.     This PCS, however, "does not alone demonstrate that the ambulance transport was medically necessary." 42 C.F.R. § 410.40(d)(2)(ii). Instead, "[a]ll other program criteria must be met in order for payment to be made." *Id.*

37.     In the limited context of transport of beneficiaries who are receiving renal dialysis treatment for ESRD, Medicare Part B will only pay for transport from the

8

beneficiary's home to the "nearest facility that furnishes renal dialysis, including the return trip." 42 C.F.R. § 410.40(e)(4).

38.     Finally, Medicare Part B requires that ambulance providers "keep appropriate documentation on file and, upon request, present it to the contractor." 42 C.F.R. § 410.40(d)(2)(ii).

39.     Kentucky Medicaid covers nonemergency ambulance services only if such service is medically necessary. 907 KAR 1:060, Section 1(6). In this context, medical necessity means, inter alia, that "[t]he recipient's medical condition warrants transport by stretcher." 907 KAR 1:060, Section 4. The ambulance provider must maintain a statement of medical necessity from the patient's attending physician that verifies that the patient was confined to bed before and after transport, required movement by stretcher, or had a medical condition that contraindicated transportation by means other than an ambulance. 907 KAR 1:060, Section 5.

40.     Kentucky Medicaid also is required to cover nonemergency medical transportation ("NEMT") services, such as transport via wheelchair van, taxi, or similar vehicle. See 42 C.F.R. § 431.53, 440.170; 603 KAR 7:080, Section 4(1). This form of transport does not include the provision of any life support services, such as the ones provided in an ambulance transport by a licensed emergency medical technician or paramedic.

### LEE COUNTY AMBULANCE'S DOCUMENTATION AND BILLING OF AMBULANCE TRANSPORTS

41.     The claims for payment that Lee County Ambulance submitted to federal health care programs via MCA contained alphanumeric codes, called Healthcare Common Procedure Coding System ("HCPCS") codes, which identify the service(s) Lee County Ambulance claimed to have provided to the patient.

42.     The HCPCS codes Lee County Ambulance most commonly used to bill nonemergency ambulance transports were A0428, which represents a nonemergency, basic

life support ambulance transport service, and A0425, which represents the mileage associated with the ambulance transport.

43.     Lee County Ambulance provided nonemergency, scheduled, repetitive ambulance transports to Medicare and Medicaid patients to Fresenius Medical Clinic dialysis clinics in Richmond, Kentucky ("FMC Richmond") and Jackson, Kentucky ("FMC Jackson"), and returned those patients to their homes via ambulance following treatment.

44.     As described above, federal regulations require Lee County Ambulance to maintain documentation sufficient to establish the medical necessity of the services it provided and billed to federal health care programs.

45.     Lee County Ambulance employees, including first responders, emergency medical technicians ("EMTs"), and paramedics were required to document any ambulance transport they staffed on a patient care report or run sheet. A paper example of the electronic run sheet MCA provided to Lee County Ambulance for this purpose is attached hereto as Exhibit 1.

46.     The run sheet contains patient identifying information, the locations where the patient was picked up and dropped off, and a basic description of the purpose of the transport. The run sheet also includes a "narrative" section, in which Lee County Ambulance employees were supposed to accurately and honestly document the patient's condition and why that condition necessitated ambulance transport. The run sheet is part of the documentation that CMS or its contractors may audit to determine the medical necessity of the ambulance transport.

47.     Lee County Ambulance was also required to maintain copies of the PCS for each nonemergency transport, an example of which is attached hereto as Exhibit 2. This form seeks general information regarding the transport, including whether the transport was to the closest appropriate facility, requires completion of a questionnaire about the medical necessity of the transport, and requires the signature of the healthcare professional. The

medical necessity section includes specific conditions from which professionals can select and requests a narrative description of the patient's medical condition at the time of transport that requires them to be transported by ambulance. The section states that the "questions must be answered <u>by the medical professional signing</u>" the PCS for the form to be valid. *See* <u>Exhibit 2</u> (emphasis in original).

48.     Lee County Ambulance sent the PCS to MCA and, according to MCA, was expected electronically to attach the form to every nonemergency transport run it submitted as a basis for a claim for payment.

### DEFENDANTS' TRAINING ON MEDICARE REGULATIONS

49.     Between March 2012 and June 2016, Defendants received repeated training and instruction on Medicare's coverage guidelines for ambulance transports. These trainings emphasized that scheduled, routine, nonemergency ambulance transports are only covered if medically necessary. These trainings also explained what constitutes medical necessity, and what documentation is necessary to demonstrate medical necessity.

50.     On March 28, 2012, the Lee County Ambulance Captain of Administration, Jennifer Smith-Morris ("Captain Smith"), asked MCA to provide a training so Lee County Ambulance employees would "be able to document what [MCA] will need and what [MCA] expect[s] for each run."

51.     On May 3, 2012, MCA's Quality Control Supervisor Tonya Ward ("QC Supervisor Ward") and MCA employee Jennifer Martin, traveled to Lee County to provide the requested training to all Lee County Ambulance employees (the "May 2012 Training"). *See* <u>Exhibit 3</u>.

52.     During the May 2012 Training, Lee County Ambulance employees were instructed that Medicare Part B only covers transport when any other means would endanger

the patient's health and that it was the responsibility of Lee County Ambulance to document medical necessity for their services. *See* Exhibit 3 at page 3.

53.     The May 2012 Training also emphasized that Medicare requires documentation of medical necessity before it will make payment on a claim in the context of nonemergency transports. This includes both a physician certification statement ("PCS") and accompanying written documentation to prove necessity. *See* Exhibit 3 at page 32.

54.     Finally, the May 2012 Training reviewed specifically what constitutes medical necessity for nonemergency, routine, scheduled transports, as well as the requirements for PCS for such transports. *See* Exhibit 3 at pages 33-36, 38-40.

55.     Lee County Ambulance began using MCA's services to submit electronic claims for payment to the Medicare and Medicaid programs immediately following the May 2012 training.

56.     MCA provided a refresher training on these requirements in the Spring of 2013 to all Lee County Ambulance employees, including Broadwell.

57.     On February 12, 2014, QC Supervisor Ward emailed a guide entitled "Facility Guidance on Medicare Coverage of Ambulance Services" from the American Ambulance Association (the "Guide") to the email address Broadwell used for his food service business, jbroadwell@kellwell.com. Broadwell read this email on March 3, 2014. This Guide detailed when Medicare would pay for the transport of beneficiaries to dialysis treatment:

> Medicare covers transports to and from the nearest End Stage Renal Disease (ESRD) facility for beneficiaries that receive dialysis treatments for ESRD. To be covered, the use of an ambulance must be medically necessary, i.e., that other modes of transportation are contraindicated. Thus, if a patient is able to ambulate (*e.g.* walk to the transport vehicle or from the vehicle into the dialysis facility), it would generally not be appropriate to transport the patient by ambulance. Similarly, if a patient is able to sit in a chair or wheelchair, it would generally not be appropriate to transport the patient to and from the dialysis facility by ambulance.

*See* Exhibit 4.

12

58.     On September 2, 2015, QC Supervisor Ward emailed Broadwell a "Document Training," which detailed the same information provided in the May 2012 Training ("September 2015 Training"). *See* Exhibit 5. Specifically, this training clarified that medical necessity is met and Medicare will cover nonemergency ambulance transport only if it is documented that the beneficiary:

- Was bed-confined before and after the ambulance trip . . .
- Could be moved only by stretcher
- Needed to be restrained to prevent injury to the beneficiary or others
- Had to remain immobile because of a fracture that had not been set or the possibility of a fracture
- Needed advanced airway management . . .
- Required non-self-administered IV meds en route
- Required chemical restraint
- Required suctioning en route . . .
- Required airway control/positioning en route . . .
- Required third party assistance . . . to apply, administer, or regulate oxygen en route . . .
- Has a condition such that patient risks injury during vehicle movement despite restraints
- Has morbid obesity which requires additional personnel or equipment to handle
- Has a communicable disease or hazardous material exposure and must be isolated from the public or whose medical condition must be protected from public exposure
- Has an orthopedic device that requires special handling en route . . .
- Has severe pain aggravated by transfers or moving vehicle such that trained expertise of EMT is required . . .
- Required positioning special handling to avoid further injury . . .
- Required positioning special handling that is inappropriate in a wheelchair or standard car seat due to contractures or recent extremity fracture . . .

*See* Exhibit 5 at pages 8-9.

59.     As for the PCS, the September 2015 Training reemphasized that for dialysis treatments, a PCS "must be completed by the patient's attending physician before repetitive or scheduled transports are furnished." *See* Exhibit 5 at page 10.

60.     MCA also set up a webinar on April 12, 2016, to provide yet another training to Lee County Ambulance employees regarding Medicare regulations related to ambulance

transports (the "April 2016 Training"). In advance of the webinar, on April 6, 2016, QC Supervisor Ward emailed Broadwell the 57-page slide show that would be presented at the April 2016 Training. Broadwell forwarded both the webinar invitation and the slide show to Captain Smith and the Lee County Ambulance Captain of Operations, Daniel Williams ("Captain Williams"). *See* Exhibit 6.[1]

61.     During the April 2016 Training, MCA presented the 57-page slide show. This presentation reviewed, again, all of the information covered in the May 2013 Training and the September 2015 Training. *See* Exhibit 6.

62.     Finally, on April 19, 2016, following the April 2016 Training, MCA sent a two-page "helpful tips for crew's and medical professional documentation" to Broadwell, which covered exactly what was required to document medical necessity on a run sheet and a PCS. This memo was distributed to all Lee County Ambulance employees. *See* Exhibit 7.

### KNOWING DECISION TO BILL MEDICALLY UNNECESSARY TRANSPORTS

63.     At the beginning of 2015, MCA switched the billing software that it used to bill Lee County Ambulance's claims. As part of this switch, MCA's Vice President, Kendi Black ("MCA Vice President Black"), took over billing Lee County Ambulance's claims while MCA's regular biller for Lee County Ambulance, Rhonda Blatt ("Blatt"), learned the new software.

64.     On March 9, 2015, MCA Vice President Black emailed Broadwell expressing her concerns with the dialysis patients Lee County Ambulance was transporting. In this email she stated, "I am not comfortable with these patients meeting medical necessity and billing

---

[1] Personal email addresses of non-parties have been redacted from this publicly filed Complaint. The United States will withdraw these redactions when providing these exhibits to Defendants via separate, secure communication.

to Medicare." *See* <u>Exhibit 8</u>. Black attached a list of transports she did not believe were medically necessary, including transports of Medicare beneficiaries G.K. and L.F.[2]

65.     Ten days later, on March 19, 2015, Broadwell responded to MCA Vice President Black's email, stating, "After reviewing this we have decided to move forward and bill for these runs and we are working on the items we talked about to help get better documentation." *See* <u>Exhibit 9</u>.

66.     On April 28, 2015, Blatt emailed Broadwell to explain again why certain dialysis patients did not meet medical necessity: "I couldn't find on any of the run sheets where the patient was actually administered oxygen. [T]he patient also has to be too weak to self administer the oxygen. [T]he fact that he or she requires oxygen, does not show medical necessity if they can administer it themselves. The pcs [*sic*] and the run sheet both have to coincide with each other to show medical necessity or these runs will continue to be billed not showing medical necessity. This will account for a majority of your runs and I'm sure it will affect your money flow." *See* <u>Exhibit 10</u>.

67.     Shortly after this email, at the request of and under the direction of Broadwell, Captain Williams posted a memorandum that stated specific guidelines for Lee County Ambulance employees to follow when completing their run sheets. These guidelines included the following:

   a.  "Do not specify that the patient walked to the ambulance and placed themselves on the stretcher. If you do nothing more than hold their hand for support, you have assisted the patient to the stretcher."

   b.  "In the 'Medical Necessity' section of the PCR, please document a viable reason for the patient to be transported by ambulance. One that covers all of the bases

---

[2] Patients are identified by their initials only in this publicly filed Complaint, and all personally identifying information has been redacted from the attached exhibits. The United States will fully identify the patients to Defendants via a separate, secure communication.

would be, 'Patient requires monitoring for hemodynamic, respiratory or cardiac decline.' MCA has stated that 'hemodynamic monitoring' is not a billable necessity."

c. "Upon arrival at the dialysis center do not document that the patient walked from the stretcher to their chair. 'Left in care of FMC staff' would be more appropriate." *See* Exhibit 11.

68.     The memo continued, "These guidelines are not to be construed as asking any employee to falsify documentation. They are to be looked at as hints to help us to continue to receive payment for services rendered to our patients." *See* Exhibit 11.

69.     On June 23, 2015, Blatt emailed Broadwell again explaining that Lee County Ambulance's reimbursements were decreasing because of the dialysis patients. She explained, "For example the hemodynamic monitoring. Blood pressure reading does not qualify as hemodynamic monitoring and that this is the only monitoring that the drivers are showing. The PCS may show that the patient requires continuous oxygen, and there isn't oxygen shown on the run sheet. [T]hese are things that are keeping the runs from getting billed." *See* Exhibit 12.

70.     Immediately following this email, at Broadwell's direction, Captain Williams wrote and posted a memo for all Lee County Ambulance employees that directed that specific "information must be documented in the run reports for our dialysis patients . . . in order for us to be paid for the call." *See* Exhibit 13.

71.     Also in response to the June 23, 2015, email, Broadwell requested a call with Blatt and MCA Vice President Black. During the requested call, Broadwell insisted that he felt that ambulance transport of these dialysis patients, and specifically Medicare beneficiary G.K., was medically necessary.

72.     On July 20, 2015, MCA Vice President Black again emailed Broadwell with a list of transports that did not meet the medical necessity requirement. This list was exclusively transports of Medicare beneficiary G.K. *See* <u>Exhibit 14</u>.

73.     On August 14, 2015, Blatt again emailed Broadwell regarding medical necessity. In this email she stated, "If the PCS states that the patient requires continuous oxygen as one of the reasons that the patient requires ambulance, then oxygen should show on the run sheet. If they are severely weak, then they shouldn't be standing on the porch when the ambulance arrives. . . . Medicare will look at these runs individually and each one needs to be able to stand alone and explain itself." She attached a list of 29 runs that were not medically necessary, including transports of G.K. and L.F. *See* <u>Exhibit 15</u>.

74.     In response to this email, Broadwell replied "We will get on fixing run sheets Monday." *See* <u>Exhibit 16</u>.

75.     This "fixing" consisted of holding a meeting with Lee County Ambulance employees, during which Broadwell instructed the employees to re-write run sheet narratives for the 29 runs identified in the August 14, 2015, email. He warned employees that if Lee County Ambulance did not make money, the ambulance company would go under, and the employees would lose their jobs.

76.     On August 25, 2015, Blatt emailed Broadwell a final list of transports that did not meet the medical necessity requirement and that MCA refused to bill to Medicare and Medicaid. All of these transports were of Medicare beneficiary G.K. on or before August 15, 2015. *See* <u>Exhibit 17</u>.

77.     On September 2, 2015, when QC Supervisor Ward emailed Broadwell to provide the September 2015 Training, she stated, as an example, that if a patient "can stand on the front porch, he can be transported another way other than and [*sic*] ambulance." *See* <u>Exhibit 5</u>.

78.     In November 2015, certain Lee County Ambulance employees confronted Broadwell and specifically stated that the transports of dialysis patients were unnecessary and would lead to Lee County Ambulance breaking federal regulations. Broadwell responded that the dialysis patients were the "bread and butter" of Lee County Ambulance and that transportation of each would continue. He also stated, in contradiction to all of the training he received and the directions he received from MCA, that if a doctor signed a PCS, then Lee County Ambulance was obligated to transport the patient.

79.     Despite knowing the federal health insurance requirements for ambulance transport, Broadwell directed Lee County Ambulance to submit false claims for medically unnecessary nonemergency, scheduled, repetitive transports beginning in at least January 2013 and continuing through the sale of its certificate of need on June 15, 2016.

80.     During this period, the Fiscal Court received in excess of $717,500 from Medicare and Medicaid for claims for the transport of beneficiaries for dialysis treatment via ambulance.

### LEE COUNTY AMBULANCE'S TRANSPORT OF PATIENTS

81.     Lee County Ambulance transported 17 Medicare and/or Medicaid beneficiaries to dialysis between January 1, 2013, and June 15, 2016. Ambulance transport was not medically necessary for a number of these dialysis patients, including, by way of representative example, Medicare beneficiaries G.K. and L.F. These two beneficiaries alone make up 67.89% of the claims paid by Medicare and 75.66% of the claims paid by Medicaid to Lee County Ambulance for dialysis transports.

82.     Lee County Ambulance and Broadwell knew that G.K. and L.F. did not need ambulance transport, but billed for the transports anyway, as described below.

**A.    Beneficiary G.K.**

83.    Medicare beneficiary G.K. began receiving dialysis treatment on October 13, 2012. Shortly thereafter, Lee County Ambulance began transporting G.K. by ambulance to his dialysis treatments three times per week.

**i.  Medically Unnecessary Transports**

84.    G.K. did not have a medical need for transport by ambulance to dialysis treatment.

85.    Shortly after he began receiving dialysis treatment, on October 25, 2012, G.K.'s nephrologist refused to sign a PCS to have G.K. transported to and from dialysis by ambulance. G.K.'s nephrologist did not sign the PCS because he did not, and still does not, believe that G.K. has a medical condition that required ambulance transport.

86.    In spite of his dialysis treatments, G.K. was a member of the Lee County Rescue Squad and an active volunteer firefighter. He was on the "call out roster" and reported at car accidents, air evacuations, and other emergency situations until the winter of 2016. Lee County Ambulance employees routinely saw G.K. at accident scenes, met him at the air evacuation point, and interacted with him in other emergency situations. This strenuous physical activity indicates not only that G.K. was ambulatory, but also that he did not have a medical condition that required ambulance transport to dialysis.

87.    G.K. was able to be transported to and from dialysis by means other than ambulance, further demonstrating that he did not have a need for ambulance transport. For example, between October 20, 2012, and December 31, 2012, Lee County Ambulance transported G.K. to dialysis using NEMT services, as opposed to basic life support ambulance services.

88.    After Lee County Ambulance stopped operating on June 15, 2016, G.K. no longer received automatic ambulance transports to his dialysis treatments; instead, his wife transported him to and from the dialysis clinic in their personal vehicle. In December 2016,

G.K.'s left leg was amputated at the knee. After a brief recovery period, during which he was transported by ambulance, G.K.'s wife continued to transport him to dialysis in their personal vehicle. G.K.'s transport to and from dialysis in his family's personal vehicle, even after his amputation, reflects, again, that G.K. did not have a medical need for transport by ambulance.

89.     Despite the lack of a medical need for ambulance transport for G.K., between January 1, 2013, and June 15, 2016, Lee County Ambulance billed Medicare and Kentucky Medicaid for transporting G.K. between his residence and FMC Richmond or FMC Jackson for dialysis treatment as basic life support ambulance services.

90.     The narratives on the Lee County Ambulance run sheets throughout this period demonstrate that G.K. was ambulatory and did not have a medical need for ambulance transport to his dialysis treatment. Despite this, Lee County Ambulance billed claims for these transports. Representative examples of the unnecessary transports of G.K. include the following:

91.     On May 16, 2013, Lee County Ambulance transported G.K. from FMC Richmond to his residence. Lee County Ambulance submitted a claim to both Medicare, numbered 662813149509920, and Kentucky Medicaid, numbered 7515068170768, for the transport using HCPCS codes A0425 and A0428. Lee County Ambulance received $435.56 from Medicare and $40.51 from Kentucky Medicaid as a result of this claim. The run sheet narrative for this claim stated that G.K. was found waiting outside FMC Richmond, "helped into back of truck by 2x EMTs, sat on stretcher, and secured in a position of comfort . . . ." *See* Exhibit 18.

92.     On September 14, 2013, Lee County Ambulance transported G.K. from his residence to FMC Richmond. Lee County Ambulance submitted a claim to both Medicare, numbered 662813274471030, and Kentucky Medicaid, numbered 7513318006061, for the transport using HCPCS codes A0425 and A0428. Lee County Ambulance received $437.25 from Medicare and $40.51 from Kentucky Medicaid as a result of this claim. The run sheet

narrative for this claim stated that G.K. was "found waiting on porch . . . us[ing] a cane for support to walk." The Lee County Ambulance employees "helped [G.K.] into back of truck and sat on stretcher . . . ." *See* <u>Exhibit 19</u>.

93.     On June 28, 2014, Lee County Ambulance transported G.K. from FMC Richmond to his residence. Lee County Ambulance submitted a claim to Medicare for the transport, numbered 66281490419460, using HCPCS codes A0425 and A0428. Lee County Ambulance received $390.42 from Medicare as a result of this claim. The run sheet narrative for this claim stated: "Patient wishes to walk to unit and be assisted into the side, EMS obliges. He is assisted into back of unit and sat on stretcher . . . ." *See* <u>Exhibit 20</u>.

94.     On December 30, 2014, Lee County Ambulance transported G.K. from his residence to FMC Richmond. Lee County Ambulance submitted a claim to both Medicare, numbered 662815019301320, and Kentucky Medicaid, numbered 7515068168098, for the transport using HCPCS codes A0425 and A0428. Lee County Ambulance received $389.92 from Medicare and $36.86 from Kentucky Medicaid as a result of this claim. The run sheet narrative for this claim stated: "[G.K.] walks and is assisted into unit, sat on stretcher . . . ." *See* <u>Exhibit 21</u>.

95.     During this period, G.K. used a wooden box as a step stool to climb in and out of the Lee County Ambulance used to transport him to dialysis. This box was built with the specific intent of enabling G.K. to more easily climb into the ambulance at his home.

96.     When confronted with the lack of medical necessity for G.K.'s ambulance transports, Broadwell told Lee County Ambulance employees that G.K. "needs to be transported by ambulance even if [Lee County Ambulance] does not get paid for it." At Broadwell's direction, Lee County Ambulance continued to seek and receive payment from Medicare and Medicaid for G.K.'s unnecessary transports.

97.     All claims for transports of G.K. between January 1, 2013, and June 15, 2016, were false or fraudulent because the transports were not medically necessary. Lee County

Ambulance and Broadwell knew, recklessly disregarded, or deliberately ignored the fact that the transports were not medically necessary. Medicare and Medicaid would not have paid these claims if they had known of the claims' false and fraudulent nature.

**ii.    Transports Not To The Nearest Facility**

98.    Medicare only covers ambulance transport to from a beneficiary's home to the nearest facility that furnishes renal dialysis treatment. 42 C.F.R. § 410.40(e)(4). Despite knowing this coverage requirement, between January 1, 2013, and May 11, 2016, Lee County Ambulance transported G.K. to a dialysis clinic that did not meet this requirement.

99.    FMC Richmond is 38.9 miles from G.K.'s residence. Between January 1, 2013, and May 11, 2016, Lee County Ambulance billed Medicare for the mileage for its transports of G.K. from his residence to FMC Richmond and back. For each of these transports, Medicare paid Lee County Ambulance an average of $258.87 for the mileage.

100.    On approximately May 11, 2016, Lee County Ambulance began transporting G.K. from his residence to FMC Jackson and back three days a week until June 15, 2016. FMC Jackson is 31.6 miles from G.K.'s residence. For each of these transports, Medicare paid Lee County Ambulance an average of $208.18 for the mileage.

101.    FMC Jackson is the renal dialysis treatment facility nearest to G.K.'s residence. On average, Medicare paid approximately $50.00 more in mileage for each transport of G.K. to FMC Richmond.

102.    Between January 1, 2013, and May 11, 2016, Lee County Ambulance billed Medicare for 875 basic life support ambulance services for transporting G.K. to and/or from FMC Richmond. Medicare paid Lee County Ambulance approximately $202,439.30 of mileage costs on 783 claims associated with these transports. Approximately $39,500.00 of these mileage costs—the additional $50 cost for each of the 783 transports to FMC Richmond as opposed to FMC Jackson—was fraudulently obtained from Medicare.

103.    All claims for transports of G.K. between January 1, 2013 and May 11, 2016 were false or fraudulent because the transports were not to the nearest facility that furnished renal dialysis treatments. Lee County Ambulance and Broadwell knew, recklessly disregarded, or deliberately ignored the fact that the FMC Jackson clinic was the nearest renal dialysis clinic to G.K.'s residence, not FMC Richmond to which G.K. was transported. Medicare and Medicaid would not have paid for these claims had they known of the claims' false and fraudulent nature.

**B.    Patient L.F.**

104.    During the period December 9, 2013 to May 30, 2016, Lee County Ambulance also provided routine transports to dialysis for Medicare beneficiary L.F. without the requisite medical need.

105.    L.F. began receiving dialysis treatment on November 19, 2012. For over a year, between November 2012 and December 2013, L.F. drove herself, had a family member or friend drive her, or used Daniel Boone Transit to go to her dialysis treatments. Daniel Boone Transit is a public transit option in Lee County that includes wheelchair service, door-to-door assistance for disabled persons, and transit for individuals that do not need assistance. Transport by personal vehicle or by Daniel Boone Transit reflects that L.F. did not have a medical need for transport by ambulance to her dialysis appointments.

106.    L.F.'s primary care physician noted repeatedly in L.F.'s medical record that "patient [is] ambulatory, able to do ADL [activities of daily living] without assistance, does her own household chores." Again, this demonstrates that L.F. did not have a medical need for transport by ambulance.

107.    The narratives on Lee County Ambulance's run sheets also demonstrate that L.F. was ambulatory and did not have a medical need for ambulance transport for the majority of the time Lee County Ambulance transported her to dialysis treatment at FMC

Jackson. Despite this, Lee County Ambulance billed claims for these transports. Representative examples of the unnecessary transports of L.F. include the following:

108.    On December 13, 2013, Lee County Ambulance transported L.F. from her residence to FMC Jackson. Lee County Ambulance submitted a claim to Medicare for the transport, numbered 662813357309500, using HCPCS codes A0425 and A0428. Lee County Ambulance received $322.28 from Medicare as a result of this claim. The run sheet narrative for this claim states, "[L.F.] walks up to the truck and is able, with little assistance by 2x EMTs, to climb into back of unit and sit on stretcher." *See* Exhibit 22.

109.    On July 2, 2014, Lee County Ambulance transported L.F. from her residence to FMC Jackson. Lee County Ambulance submitted a claim to Medicare for the transport, numbered 662814199351340, using HCPCS codes A0425 and A0428. Lee County Ambulance received $317.99 from Medicare as a result of this claim. The run sheet narrative for this claim stated that L.F. "is able to walk to and climb into unit with little help . . . ." *See* Exhibit 23.

110.    On February 20, 2015, Lee County Ambulance transported L.F. from FMC Jackson to her residence. Lee County Ambulance submitted a claim to Medicare for the transport, numbered 662815085346740, using HCPCS codes A0425 and A0428. The run sheet narrative for this claim stated, "[L.F.] walked to stretcher without assistance [and] set down on stretcher. . . [L.F.] refused for vitals to be checked. . . Upon arrival at [L.F.'s] residence, [L.F.] undone stretcher belts, and was assisted off of ambulance. [L.F.] walked to her residence unassisted. [L.F.] own POA." When billing this claim to Medicare, MCA added a GY modifier to this transport, indicating that it was "statutorily excluded, does not meet the definition of any Medicare benefit." Lee County Ambulance did not receive any funds from Medicare as a result of this claim. *See* Exhibit 24.

111.    On February 3, 2016, L.F.'s medical records from her primary physician indicate that she could not afford the local transportation option, and so her physician completed a PCS stating that because she had no other means of transportation, that

ambulance transport was necessary.  Lack of alternative transportation, however, does not render ambulance transport medically necessary.  *See* Medicare Benefit Policy Manual, Chapter 10, Section 10.2.1.

112.    Between December 9, 2013, and June 15, 2016, Lee County Ambulance billed Medicare for 533 basic life support ambulance services for transporting L.F. to and from FMC Jackson. Medicare paid Lee County Ambulance approximately $146,375.77 for 456 of these transports.

113.    All claims for transports of L.F. between January 1, 2013, and June 15, 2016 were false or fraudulent because the transports were not medically necessary. Lee County Ambulance and Broadwell knew, recklessly disregarded, or deliberately ignored the fact that the transports were not medically necessary. Medicare and Medicaid would not have paid these claims if they had known of the claims' false and fraudulent nature.

### KNOWINGLY MAKING OR USING FALSE RECORDS MATERIAL TO FALSE CLAIMS

114.    As described above, Medicare regulations require that ambulance transportation providers "keep appropriate documentation on file," including run sheets and PCSs. 42 C.F.R. § 410.40(d)(2)(ii). Additionally, regulations require that PCSs for nonemergency, scheduled, repetitive runs must be obtained by the ambulance transportation provider from a physician prior to the initial transport of the beneficiary. 42 C.F.R. § 410.40(d)(2)(i).

115.    Lee County Ambulance and Broadwell routinely made, used, or caused to be made or used, false or fraudulent records in these run sheets and PCSs by (1) misrepresenting the abilities of the individuals being transported on the run sheets; (2) completing the PCS forms themselves; (3) either altering the date on which the physician signed the PCS or backdating the PCS; and (4) forging the physician's signature on the PCS.

116. First, as described above in paragraphs 67, 68, and 70, at the direction of Broadwell, Captain Williams posted memoranda for all Lee County Ambulance employees to review providing guidance about run sheet narratives. Again, these memoranda directed, for example, that employees state that they assisted patients instead of specifying that patients walked.

117. This guidance, as well as the meeting in which Broadwell instructed employees to re-write run sheets, as described in paragraph 75 above, directly affected the language that Lee County Ambulance employees used in the run sheet narratives.

118. For example, Lee County Ambulance EMT Dwayne Oliver ("EMT Oliver") routinely wrote that G.K. was "none [*sic*] ambulatory without medical assistance" in his run sheets, despite his partner, Lee County Ambulance EMT Andrew Neace ("EMT Neace") describing G.K. as walking to and getting into the ambulance prior to sitting on a stretcher on the same day. *Compare* pages 1-6 of Exhibit 25 to pages 7-12 of Exhibit 25.

119. Lee County Ambulance submitted a claim to both Medicare, numbered 662815055290240, on February 24, 2015, and Kentucky Medicaid, numbered 7515185031418, on June 30, 2015, for the transport of G.K. described by EMT Oliver above and in Exhibit 25 using HCPCS codes A0425 and A0428. Lee County Ambulance received $392.66 from Medicare and $37.41 from Kentucky Medicaid as a result of this claim.

120. Following the June 2015 memorandum, EMT Oliver also used the exact language provided in the memorandum found in Exhibit 13 in the narrative for a transport of G.K. *Compare* Exhibit 13 with page 2 of Exhibit 26.

121. Based on run sheets using the June 2015 memorandum, Lee County Ambulance submitted claims to Medicare and Kentucky Medicaid. For example, Lee County Ambulance submitted a claim to both Medicare, numbered 662815203318480, on July 22, 2015, and Kentucky Medicaid, numbered 7516159003444, on June 4, 2016, for the transport of

G.K. described in Exhibit 26 using HCPCS codes A0425 and A0428.  Lee County Ambulance received $403.02 from Medicare and $37.41 from Kentucky Medicaid as a result of this claim.

122.    EMT Neace's own narratives also changed following the August meeting about fixing run sheets. Instead of routinely describing G.K. as walking to the ambulance, stretcher, or his home, EMT Neace's narratives describe assisting G.K. *See* Exhibit 27.

123.    Second, Broadwell routinely directed Lee County Ambulance employees to request that the physicians for G.K. and L.F. sign PCS forms that the physician did not actually complete.

124.    For example, on April 24, 2014, Lee County Ambulance faxed a letter to the physician for L.F. requesting his signature on a PCS, which was included and had already been completed except for the missing physician signature and date. *See* Exhibit 28.

125.    Lee County Ambulance relied on this PCS when submitting a number of claims.  For example, on December 19, 2014, Lee County Ambulance submitted a claim to Medicare, numbered 662814343385420, for the transport of L.F. on May 28, 2014, using the signed version of the PCS found in Exhibit 28 using HCPCS codes A0425 and A0428.  Lee County Ambulance received $325.63 from Medicare as a result of this claim.

126.    Third, some of these PCSs were completed after the beneficiary was transported to dialysis, but they were back-dated by Lee County Ambulance to appear as though they were signed prior to transport.

127.    For example, on January 21, 2015, MCA asked Lee County Ambulance for a PCS for Medicare beneficiary E.A. for her treatments that started on January 2, 2015. It asked again on January 29, 2015, and clarified that a PCS signed by a registered nurse was not sufficient. Broadwell stated that he had sent an employee to obtain a PCS that day. Five days later, MCA received the PCS dated January 1, 2015, by a Lee County Ambulance employee and billed the claims submitted by Lee County Ambulance for the transport of patient E.A. to that point. *See* Exhibit 29.

27

128.    Lee County Ambulance used this back-dated PCS to submit claims to Medicare and Medicaid.  For example, on February 2, 2015, Lee County Ambulance Lee County Ambulance submitted a claim for the January 14, 2015 transport of E.A. to Medicare, numbered 662815033350420, using HCPCS codes A0425 and A0428. Lee County Ambulance received $325.33 from Medicare as a result of this claim.

129.    Also, by way of an example, on February 23, 2015, Lee County Ambulance faxed a PCS that was pre-completed and dated February 1, 2015, to L.F.'s physician for his signature. *See* Exhibit 30.

130.    Lee County Ambulance went even further and altered dates on PCS forms in an attempt to comply with Medicare regulations.

131.    In a number of instances, Lee County Ambulance altered the same PCS form over the course of multiple months. *See* Exhibits 31 and 32.

132.    Occasionally, Lee County Ambulance even sent the PCS back to the physician—who signed and dated the statement—and Lee County Ambulance would change the date on the form to appear as if it had been completed before the transports began. *See* Exhibit 33.

133.    Lee County Ambulance routinely submitted claims based on these altered PCS. By way of example, Lee County Ambulance submitted a claim to Medicare on July 9, 2015, numbered 662815190430130, and a claim to Kentucky Medicaid on June 4, 2016, numbered 7516159003895, for the transport of G.K. on June 20, 2015 that relied upon the altered PCS found in Exhibit 33 using HCPCS codes A0425 and A0428.  Lee County Ambulance received $403.02 from Medicare and $37.41 from Kentucky Medicaid as a result of these claims.

134.    Finally, Lee County Ambulance also either forged the signature of physicians on PCS forms or submitted PCSs with forged signatures to be able to submit claims to Medicare and Kentucky Medicaid for payment.

28

135.    For example, the December 2, 2015, PCS for Kentucky Medicaid beneficiary J.G. was signed by someone who misspelled the physician's name. The physician does not misspell his own name when signing documents and did not complete or sign this form. *See* Exhibit 34.

COUNTS

### Count I: False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

136.    The United States restates and incorporates by reference paragraphs 1 through 102 of the Complaint, as if fully set forth herein.

137.    Between January 1, 2013 and November 1, 2017, Lee County Ambulance knowingly presented, directly or indirectly, false or fraudulent claims for payment to the United States for nonemergency ambulance transport services billed to Medicare and Medicaid. These claims were false or fraudulent because they sought payment for nonemergency transport services to a facility that was not the nearest facility that furnished renal dialysis to the residence of G.K. If Medicare and Medicaid had known that these transports were not to the nearest renal dialysis treatment facility, they would not have paid the claims.

138.    As a result of the false or fraudulent claims presented by Lee County Ambulance, the United States suffered damages of approximately $39,500.

### Count II: False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

139.    The United States restates and incorporates by reference paragraphs 1 through 102 of the Complaint as if fully set forth herein.

140.    Between January 1, 2013 and November 1, 2017, Joseph R. Broadwell knowingly caused to be presented false or fraudulent claims for payment to the United States for nonemergency ambulance transport services billed to Medicare and Medicaid. These

29

claims were false or fraudulent because they sought payment for nonemergency transport services to a facility that was not the nearest facility that furnished renal dialysis to the residence of G.K. If Medicare and Medicaid had known that these transports were not to the nearest renal dialysis treatment facility, they would not have paid the claims.

141.    As a result of the false or fraudulent claims that Broadwell caused to be presented, the United States suffered damages of approximately $39,500.

## Count III: False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

142.    The United States restates and incorporates by reference paragraphs 1 through 112 of the Complaint as if fully set forth herein.

143.    Between January 1, 2013 and November 1, 2017, Lee County Ambulance knowingly presented, directly or indirectly, false or fraudulent claims for payment to the United States for nonemergency ambulance transport services billed to Medicare and Medicaid. The claims were false or fraudulent because they sought payment for nonemergency ambulance transport services that were not medically necessary or reasonable. If Medicare and Medicaid had known that these transports were not medically necessary, the government would not have paid the claims.

144.    As a result of the false or fraudulent claims presented by Lee County Ambulance, the United States suffered damages in an amount to be determined at trial.

## Count IV: False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

145.    The United States restates and incorporates by reference paragraphs 1 through 112 of the Complaint as if fully set forth herein.

146.    Between January 1, 2013 and November 1, 2017, Joseph R. Broadwell knowingly caused to be presented false or fraudulent claims for payment to the United States for nonemergency ambulance transport services billed to Medicare and Medicaid. The claims

were false or fraudulent because they sought payment for nonemergency ambulance transport services that were not medically necessary or reasonable. If Medicare and Medicaid had known that these transports were not medically necessary, the government would not have paid the claims.

147.     As a result of the false or fraudulent claims that Broadwell caused to be presented, the United States suffered damages in an amount to be determined at trial.

**Count V: False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**

148.     The United States restates and incorporates by reference paragraphs 1 through 129 of the Complaint as if fully set forth herein.

149.     Between January 1, 2013 and November 1, 2017, Lee County Ambulance and Joseph R. Broadwell knowingly made, used, or caused to be made or used, false records or statements in the transport records regarding the conditions of patients during transport. These records or statements were material to claims for payment submitted to the United States, and specifically the Medicare and Medicaid programs. If Medicare and Medicaid had known that the claims Lee County Ambulance submitted for payment contained or were based upon these false records or statements, they would not have paid the claims.

150.     Between January 1, 2013 and November 1, 2017, Lee County Ambulance and Joseph R. Broadwell knowingly made, used, or caused to be made or used, false records or statements regarding the medical necessity of ambulance transport of patients by those patient's physicians, *i.e.* false physician certification statements. These records or statements were material to claims for payment submitted to the United States, including in particular the Medicare and Medicaid programs. If Medicare and Medicaid had known that the claims Lee County Ambulance submitted for payment contained or were based upon these false records or statements, they would not have paid the claims.

151.    As a result of the false records or statements made, used, or caused to be made or used by Lee County Ambulance and Joseph R. Broadwell, the United States suffered damages in an amount to be determined at trial.

### Count VI: Unjust Enrichment

152.    The United States restates and incorporates by reference paragraphs 1 through 129 of the Complaint as if fully set forth herein.

153.    Between September 11, 2013 and November 1, 2017, directly or indirectly, Lee County Ambulance received and retained the benefit of federal monies paid from Medicare and Medicaid and intended to compensate Lee County Ambulance for medically reasonable and necessary nonemergency ambulance transport services.

154.    The nonemergency ambulance transport services for which Medicare and Medicaid paid Lee County Ambulance were not medically reasonable and necessary.

155.    Directly or indirectly, Lee County Ambulance has been unjustly enriched with federal monies from Medicare and Medicaid, in an amount to be determined at trial, which they should not in equity and good conscience be permitted to retain.

### Count VII: Payment by Mistake

156.    The United States restates and incorporates by reference paragraphs 1 through 129 of the Complaint as if fully set forth herein.

157.    This is a claim for recovery of monies paid by the United States to Lee County Ambulance between September 11, 2013 and November 1, 2017, as a result of mistaken understandings of fact.

158.    The false claims which Lee County Ambulance submitted or caused to be submitted to the United States were paid by the United States based upon mistaken or erroneous understandings of material fact.

159.    The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Lee County Ambulance, paid Lee County Ambulance certain sums of money to which Lee County Ambulance was not entitled. In particular, the United States relied upon Lee County Ambulance's representation that the claims sought payment for medically necessary and reasonable services, when in point of fact the services were not medically necessary or reasonable. Lee County Ambulance thus is liable to account for and to pay such amounts, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America requests that judgment be entered in its favor and against Defendants as follows:

1.      On Counts I, II, III, IV, and V, under the False Claims Act, against Defendants, jointly and severally, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.      On Counts VI and VII, for unjust enrichment and payment by mistake, against Lee County Ambulance alone, for the amounts mistakenly paid to Lee County Ambulance or by which Lee County Ambulance was unjustly enriched, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.      With respect to each Count, interest, attorney's fees, and costs as allowed by law, and any and all further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the United States demands a trial by jury on all issues raised in its Complaint.

Respectfully submitted,

ROBERT M. DUNCAN, JR.
UNITED STATES ATTORNEY

By: _Jennifer A. Williams_
Jennifer A. Williams
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507
859.233.2661
859.233.2533 (fax)
Jennifer.A.Williams2@usdoj.gov

34